## LIVINGSTON MOORE v. THE STATE.

**Criminal Law — Evidence — Experts.**

In a criminal trial a witness called upon to testify as to his opinion upon matters of science, is competent to testify, although he is unable to state that he is perfectly familiar with ·all the principles connected with a science for forming a part of it.[1]

**Same — Physician — As Expert.**

A physician who testifies that he is a practicing physician, and that in preparing himself for the practice of his profession it was necessary to make chemistry a study to such an extent as to learn the ordinary and recognized tests for the discovery of strychnine, possesses sufficient information to entitle the State to examine him as to his opinion as to whether certain substance found in a spring is strychnine or not.

**Same — Verdict — When Not Disturbed.**

A verdict of a jury which is not manifestly wrong on the facts will not be disturbed.[2]

Appellant Moore was tried and convicted in the Circuit Court of Hinds county of poisoning a spring and sentenced to the penitentiary, and appeals.

The evidence in the case was entirely circumstantial, being, in

1

The opinion of an expert is competent evidence to go to the jury, on an issue involving the genuineness of a written intsrument, although such expert be unacquainted with the handwriting of the writer of the instrument, but such evidence is intrinsically weak and ought to be received and weighed by the jury with great caution. Moye v. Herndon, 30 Miss. 110.

When the dead body or remains have been discovered and identified, and the immediate cause of the. death remains unknown, the sworn observations and opinions of physicians and other scientific persons are often of the greatest value in explaining the means of the death. Pitt's case, 43 Miss. 472.

The opinions of any person skilled in any science, art or trade are admissible in evidence in relation to matters connected with his profession. The means of detecting counterfeit bills, by an inspection of the devices and marks used in etching and engraving such instruments, is .an art, and a person skilled therein may give in evidence his opinion in relation to the genuineness of a bank bill without being acquainted with the handwriting of the president or cashier of the bank, whose names are signed to the bill. Jones v. Finch, 37 Miss. 461.

It is not necessary that a physician should be a graduate of any medical

substance, that the defendant had purchased a number of bottles of strychnine within the twelve months preceding the time the poison was found in the spring, and had charged John Moore, who lived near the spring, with having ravished his wife and threatened to kill him; that one of John Moore's boys went to the spring one morning and found a sock in the spring, which had been suspended from a nail on the side of the boxing of the spring, and seven bottles of what was thought to be strychnine in the sock; that defendant taught school near Utica, and lived near the spring, or within three or four miles of it, and in coming home from his school he passed within a mile and a half of the spring. Mule tracks were found near the well and were traced in the direction of where defendant lived. One bottle of strychnine had been purchased in Raymond by one Ike Moore a short time before the strychnine was found in the spring, from Harper &

college, or have a license to practice from any medical board, in order to render him competent to testify, as an expert, in relation to matters connected with his profession. N. O. J. & G. N. R. R. Co. *v.* Albritton, 38 Miss. 242.

But the rule allowing experts to testify as to their opinion does not extend so as to allow a person who has never studied or practiced the science of surgery, but who has seen six or eight gunshot wounds, and as many made by sharp instruments on the human body, to give his opinion as to whether a wound was made by a gunshot or a sharp instrument. Caleb's case, 39 Miss. 721.

Expert testimony is not required to prove the value of a lot of "hardware, dry goods, groceries and miscellaneous articles." A witness, though a dealer in only one of the lines mentioned, is competent to testify as to the value of the articles in all. Carberry *v.* Burns, 68 Miss. 573; 9 So. 290; Cooper *v.* State, 53 Miss. 393.

In a suit against a railroad company for failing to maintain proper cattle guards, witnesses, though experienced in railroad building, cannot give their opinions as to the sufficiency of the guards in question. Testimony should be confined to their actual condition, leaving the jury to decide whether they are sufficient. Railroad Co. *v.* Spencer, 72 Miss. 491; 17 So. 168.

2

Where the verdict of a jury is not supported by the evidence in the case, it should be set aside by the court. Barnett *v.* Jayne, 1 Miss. Dec. 65, and cases cited in note 2.

The verdict of a jury will be set aside on consideration of the facts alone, if they fail to sustain it. Allen *v.* State, 1 Miss. 126, and cases cited in notes.

A decree of the lower court will not be reversed in the Supreme Court unless the record affirmatively shows that injustice has been done, the pre-

Co., druggists there, and a bottle found in the spring had Harper's advertisement on it, and it was shown that defendant sent to Ike Moore's for a package and something like a bottle was sent to him.

Drs. Grant and Bogle were examined by the State as experts to give their opinion as to whether the substance which was brought to them, and that had been taken from the spring, was strychnine or not; they testified that they were practicing physicians and had studied chemistry, but were not expert chemists; knew how to apply the ordinary tests for strychnine, and they examined the substance and found it to be strychnine; did not know whether the same tests applied to other substances will produce the same result or not. Defendant's motion to exclude this testimony on the ground that they were not experts was overruled.

APPEALED from Circuit Court, Hinds county, second district, S. S. CALHOUN, Judge.

Affirmed, April 18, 1881.

*Attorneys for appellant, Gillespie & North, and Wells & Williamson.*

*Attorney for the State, T. C. Catchings. Attorney-General.*

Brief of Gillespie & North:

As the evidence in this case is wholly circumstantial, consisting of a number of circumstances attempted to be connected by

sumption being that the court had sufficient reasons for its action. Smith *v.* Harris, 1 Miss. Dec. 210, and cases cited in note 1. See cases cited in 1 Miss. Dec. 407, note 1.

A verdict will not be allowed to stand where there is palpable failure of the proof to sustain it. In such cases a new trial will be granted. Campbell *v.* State 1 Miss. Dec. 413, and cases cited in note.

Manifest error in a verdict is sufficient ground for the reversal of the judgment thereon. Walker *v.* State, 1 Miss. Dec. 431, and cases cited in notes.

If the verdict of a jury is contrary to the evidence and the instructions of the court, it should be set aside and a new trial granted by the court. Turley *v.* Ingram, 1 Miss. Dec. 542, and cases cited in notes.

The judgment of the Circuit Court will be reversed on the ground that the verdict is wrong, when no error of law is complained of, if the evidence is insufficient to support the verdict of the jury. Porter *v.* State, 1 Miss. Dec. 555, and cases cited in notes.

the prosecution, no one of which, even if indubitably established, would in itself be sufficient to raise a presumption of the guilt of the accused, we respectfully submit that these independent circumstances, when united, were insufficient to have warranted the conviction of either of them. The facts chiefly relied upon by the State to establish the guilt against both of the accused are:

First. The purchase of the strychnine by Witness Curry by the request of Isaac Moore.

Second. The conveyance from Isaac to Liv. Moore.

Third. The putting of the strychnine in the Blackburn spring on the night of the 16th of July, 1880, by some one.

It was shown by the witness, Curry, that, at the request of Isaac Moore to buy him *some* strychnine, he called at Harper's store at Raymond, July 7, 1880, for an *ounce,* but purchased only a drachm bottle of the same, which, as he states, was wrapped in a piece of white paper, on which there were no marks, so far as he noticed. This was delivered to Isaac Moore. Here Witness Curry's knowledge of the further disposition of this bottle of strychnine ceases. During the further progress of the trial in the court below the State attempts to show by the testimony of one William Harris, who lived with Liv. Moore at that time, that this bottle of strychnine was delivered on the day of its purchase to Liv. Moore. This witness, whom the court must perceive is a very ignorant person, states that Liv. sent him to Isaac to bring that "arr;" that witness told Isaac that Liv. said send him that "arr." This witness states that he did not know what it was, though it felt like a bottle. The State failed to show by him with what colored paper, if any at all, this package was wrapped.

The State attempted to show by the witness, Harper, how the bottle in question was wrapped; he testified that it was wrapped in a Hall's or Ayers' advertisement; he thought, however, it was a Hall's—both Hall's and Ayers' circulars had his (Harper's) advertisement on them. In the contents of the stock and bag, this witness, upon their being exhibited before him, recognized the wrapper by its having his name printed on it, and in that connection stated that he had wrapped up everything he sold in that kind of a wrapper; he further stated that it was probable that within the last twelve months he had sold bottles of strychnine to other persons, and that he did not know but that he had wrapped up bottles of strychnine in *that* paper and sold it to other persons.

By the witness, John Moore, the State proved that in the mass contained in the sock and bag taken from the Blackburn spring on the morning of the 17th of July, 1880, there was a wrapper found with Ayers' and Harper's advertisements on it. The State then, in order to show that Liv. Moore, the appellant, was the perpetrator of the crime charged, attempted to prove by John Moore and other witnesses that the signs or tracks and other evidences came from and went in a direction that would tend to cast suspicion upon the accused as the guilty party. By John Moore it was shown that Liv. and he were on bad terms; that in hunting signs he found a mule track going toward the east and traced it out into the Raymond and Crystal Springs road, thence down that road about three-fourths of a mile. It was shown by three witnesses that the tracks came from the direction of a plantation known as the Dees place, which lies between the north and south Terry and Utica roads. The testimony of this witness and of the witness, Walls, as to the direction from which the tracks approached the Dees place, conflicts with that of the witness, Dulaney, they stating that the tracks approached this place from the direction of Dry Grove, which is northward, he stating that they approached from a southerly direction, to wit: from the cross-roads church. The only other circumstances which the State offered to prove implicating Liv. Moore was the fact that he had purchased on the 13th of June, 1879, two vials of strychnine from Witness Seals at Terry, a time too remote to create a presumption of guilt.

To the following facts we call the especial attention of the court: None of the witnesses are shown to have ever made an examination for human tracks about the spring; that John Moore and several persons went to the spring on the morning in question, drew water from it, and they and their families drank of and cooked with it without being made sick by or discovering any bitter taste to the water; that the alleged poison was not found in the spring until about 11 o'clock of that day; that it was then found by John Moore's *little boy,* in a *boy's sock,* securely tied to a nail on the inside of the spring box; that, though John Moore was absent from his house at that time, he *happened* to be within hailing distance of the spring when the astounding discovery was made and the alarm was given by this *small* boy, who, we might ordinarily suppose, would be but little surprised at

finding a boy's sock suspended from a rusty nail into a spring of water. And to the quick response of John, his family, and the other colored people thereabouts, to this boy's summons, and to the further fact that, although something was taken from the spring, no examination of it was made or permitted until the following day (Sunday), the "stuff" in the meantime remaining in John Moore's possession; and it will be remembered by the court that none of the witnesses but John, as the proof shows, knows, or was told, or found out, what were the contents of that bag and sock until the Monday following that Sunday. To these pertinent facts we ask your attention.

We contend that the improbability, nay, impossibility, of any sane person approaching the spring with such murderous intent as is charged in the indictment, and taking the time or precaution in the darkness of the night to search for a nail or any means of suspending in the water such a murderous potion, and yet be so forgetful as not to destroy the wrapper or any other evidence that might expose him; and the further impossibility of any sane person committing such a vile deed two hundred yards from the house of his intended victim, and afterwards approaching his very front door to scale a fence, when he might have made his escape by crossing the fence near the spring, coupled with the acts of John Moore in not exhibiting the "stuff" that was taken from the spring to his colored neighbors or telling them what the contents of the sock and bag were until the Monday following; and the further fact or act of his not showing at any time their contents to his white neighbors who lived in the immediate vicinity of the spring; and the further very significant fact of there remaining a teacup full of the substance taken from the spring after its supposed suspension in the same for at least twelve hours, is, we urge, sufficient cause to raise a reasonable doubt as to who was the guilty party.

We insist that the State failed to show that on that occasion Liv. Moore rode a mule from Utica to his home; Harris, the only witness on that point, says that when Liv. returned to his home from Raymond, he carried his horse with him to Utica, where he was teaching; and that when he came back home, which was on a Friday night about the time of the supposed poisoning, he came on his horse.

We would suggest that, from the proof in the cause, it is more

than probable that the tracks referred to were made by some mule running at large, as it was shown there were quite a number of mules in that neighborhood.

The proof showed that there were seven drachm vials of substance found in the spring, which, from the dimensions given, could not have held more than twenty-five gallons of water, while it was shown by the doctors examined that three drachms of strychnine would in a little while poison twenty gallons; yet it is in proof that this water was neither poisoned nor made bitter by the seven drachms therein found.

The State failed to show that either of the accused parties *ever* had possession of more than three drachms of strychnine; it was shown that two drachms of it were purchased by Liv. Moore more than a year before the supposed poisoning by stating at the time of the purchase that it was for a third party; as to the other bottle, it has already been shown by Curry's testimony it was bought for Isaac, the witness stating that he thought he knew, from what his wife had said to Isaac Moore, that he knew for what purpose the strychnine was bought, and that Isaac had told him he used it, after the indictment was found, however, to kill minks. The statement of what was done with the strychnine was excluded from the jury by the court below.

The only proof offered by the State to contradict Liv. Moore's statement, made at the time of his purchase, was the testimony of Seals, who only stated, "I don't know any man by that name."

Taking into consideration the previous good character of both of the accused, as shown by a number of witnesses, and the want of any attempt on their or either of their parts to flee from a prosecution, or to make statements favorable to themselves, we feel compelled to urge that the jury found contrary to the evidence and the instructions of the court below. See John (a slave) *v*. State, 2 C. 569; Caleb (a slave) *v*. State, 39 Miss. 721; Algheri *v*. State, 3 Cush. 584; Pitts *v*. State, 43 Miss. 472.

The verdict did not sustain the charge in the indictment. There is no proof of the spring being poisoned. We contend that the testimony of Drs. Jones and Grant shows beyond a doubt that seven drachms of strychnine would have poisoned a much larger quantity of water than the proof shows it was possible for the Blackburn spring to have held. The proof is that, after the supposed strychnine had remained in the spring for at least

twelve hours, the water neither tasted bitter, nor did the use of it make any one sick. See Code 1871, § 2809; 50 Miss. 492.

\* \* \*

The testimony of Drs. Bogle and Grant as experts should have been excluded, it being shown that they were not chemists. See Caleb's Case, 39 Miss. 721.

We submit that the judgment of the court below was erroneous, and ask that it be reversed.

Brief of Wells & Williamson:

The substance which was found in the spring was subjected to an analysis by Dr. Grant, who testified that he was not a professional chemist, and the defendants, by their attorneys, objected to his stating his opinions to the jury as to what the substance was, which objection was overruled by the court, and this is the first question arising in the case, to wit: Ought that testimony to have been admitted to the jury? The rule, as we understand it, is that only those skilled in their profession should be allowed to testify as to their opinions of a matter concerning which only those so skilled could know. Dr. Grant admitted that he did not know whether the same test applied to ferrio cyanide of potassium would produce the same result or not, and did not know but that there were other substances that would give the same result as that of strychnine; and Bogle's testimony is about to the same effect, and subject to the same as that of Dr. Grant. Payson v. Everett, 12 Minn. 216; Commonwealth v. Rich, 14 Gray, Mass. 335; Emmerson v. Lowell, etc., 6 Allen, Mass. 146.

We insist that only a professional chemist, who would state that he was capable of making nice chemical distinctions, should have been permitted to testify as to what substance was in the spring.

Second. Our next and the main thing upon which we rely for a reversal of this case is that the verdict is not sustained by the evidence in the case. The whole case is based upon circumstantial evidence—nine circumstances which are totally disconnected, and which scarcely, if at all, tend to show the guilt of the accused.

The evidence does not show beyond a reasonable doubt that there was any poison in the spring.

There is no proof that the substance found in the spring was placed there by Livingston Moore.

There is not the slightest proof that the substance found in the spring poisoned it.

We propose to take each of these propositions in detail, and, if we are correct in either of them, it will be admitted that a new trial should be granted. There is, perhaps, no doubt that there was a substance found in the spring. There is no proof that it was strychnine, except that of Dr. Grant, who made the analysis, and that of R. L. Bogle, both of whom testified as experts, the former as having made a chemical analysis of the substance found there, and the latter stating his opinion upon the facts as related by Dr. Grant.

We think that we have shown that this was incompetent evidence and should not have been permitted to go to the jury. Again, we insist that the testimony of all the physicians in this cause goes to show that, if this was strychnine, two results would have followed—first, the water would have been rendered exceedingly bitter; second, that the amount of the substance found in the spring, had it been strychnine, would have caused sickness, if not death, to those who used it. Dr. Grant testifies to this; also Dr. Bogle and Dr. Jones. Now, it is true that all these people who used water out of the spring testify positively that they discovered no difference in the taste of the water, and not one single individual was made the least sick from the use of it, and no one died from it. This spring could not have held over twenty gallons of water, and yet the testimony of the physicians goes to show that as little as three drachms of strychnine in a loose state would have poisoned the spring, and being in a sock or cotton sack only would have retarded its solubility and made it so it would have poisoned for a greater length of time. We submit, therefore, that not only did the State fail to show that there was poison put in the spring, but the testimony shows that the substance was not strychnine, as is claimed.

There is no proof that the substance found in the spring was placed there by Livingston Moore. The proof on the point is purely speculative, purely circumstantial, and the following are the circumstances which, it is claimed, show his guilt: Judge Curry bought for Isaac Moore a bottle of strychnine—as Isaac stated—to kill minks which were destroying his poultry. That it was bought from Harper, by him wrapped in a paper with Ayers' Hair Vigor advertisement on it, on which was also printed

"H. W. Harper & Co.," druggists, etc. That Liv. Moore got it from Isaac Moore, and, in coming from his school at Utica, he came by the spring and put it in. That the substance found in the spring is the same as that sold to Isaac Moore, because in the sock in the spring with the broken bottle was found an advertisement of Ayers with H. W. Harper printed on it. That Liv. Moore and John Moore were on bad terms. The theory of the State is that Liv. Moore rode a mule from Utica on the night before the substance was found by Dory Moore, and rode to the spring and there placed the substance in it during the night.

Taking these circumstances, now let us see if there is proof to sustain them, and whether or not they are so connected as to create even a presumption that Livingston Moore put the substance in the spring.

It is undoubtedly true that Isaac Moore obtained a vial of strychnine from Harper through Curry, and it is perhaps true that it was wrapped in an Ayers' Hair Vigor advertisement with H. W. Harper on it.

But this second proposition, we submit, is not true, to wit: that Isaac Moore gave the poison to Liv. Moore, and that he, in coming from Utica, came by the spring and put it in it. There is nothing to show that Liv. Moore got the poison from Isaac Moore. The only thing that can be construed to show it is the testimony of William Harris. He states that he was sent by Liv. Moore on one occasion to Isaac Moore's house, with the message to him to send "that are." That he went to Isaac Moore's, and he sent something back that felt like a bottle. There is no proof as to whether it was a large or a small bottle, nor is there the slightest proof of what was contained in the bottle, even if it was a bottle. There is no proof of the time that this occurred. It is just as reasonable to presume that it was something else as that it was strychnine. We submit that it was more likely to have been whiskey, and Liv. Moore did not want Harris to know what it was, to keep him from drinking it on the way. At any rate, we are left in the broad field of conjecture as to what was contained in the package sent. There is no proof that Liv. Moore came on that Friday night home from Utica—it is mere conjecture on that point. Curry does not say that he saw him at his home on Sunday—that he was expected at Terry to take the train Saturday and failed to come. There is no proof that he left his school

near Utica on Friday, which he must have done to put the substance in the spring on Friday night. Indeed, as he failed to reach the train on Saturday at Terry to go to Jackson, he must have come to his home on Saturday night—the night after the substance was found in the spring. There is no proof that he had any acquaintance with the spring, and he had not been seen even in the neighborhood of the spring for more than a year. The theory that he rode a mule by the spring and put the substance in it is not supported by the evidence. The only proof of his riding from Utica is the testimony of William Harris, who testified that the first time he came home after he went to Utica in July he came home on his *horse*. The proof about the mule track is conflicting. All agree that it went in the direction of Crystal Springs, and, as there were many persons and mules in that direction, it is just as reasonable to say it was some one else as Liv. Moore. It is true, some of the witnesses who were anxious to convict say that the mule track went in the direction of Liv. Moore's, but on cross-examination they admitted that the tracks went on the Crystal Springs and Raymond road in the direction of the former place. But there is no proof to show that Liv. Moore lived in that direction. On the contrary, it is shown that he lives some two miles south of Terry, immediately on the railroad. There were human tracks found about the spring, and we submit that the person who put the substance in the spring was one who was well acquainted with the spring, or else how would he have found it, and how would he have known that there was a nail there on which to hang the sock? The sock was a boy's sock, and it is not shown that Liv. Moore had any children about his house.

But it will be insisted that, inasmuch as the Ayers' Hair Vigor advertisement with H. W. Harper & Co. on it was in the sock, and the bottle of poison sold to Curry was wrapped by Harper in that kind of paper, therefore that is proof that Liv. Moore put the substance in the spring. We admit this is the strongest proof in the whole case against the accused. Let us see if it is not just as reasonable to suppose some one else did it as Liv. Moore. Harper says he may have sold a bottle of strychnine to other parties besides Curry, and that he wrapped everything in the same kind of paper. If the substance was strychnine, then we submit that, as other persons are buying such things, and especially physi-

cians, it is certainly a violent presumption that this was the only bottle bought, and that on this was the only wrapper with that advertisement on it. We contend that to hold that the substance found in the spring was the bottle of strychnine bought by Curry from Harper is to hold that Harper sold to no other person strychnine, and wrapped no other package with the Ayers' Hair Vigor wrapper. And yet he says he may have sold other strychnine, and that he wrapped everything in that kind of wrapper. These wrappers, he says, were loose on his counter, and any one could go there who chose to and get them whenever they wanted to. Now, when it is remembered that the water was not poisoned, nor was it bitter, it is just as reasonable to presume that some other substance with these wrappers on it was put there by this man, John Moore, his personal enemy.    *    *    *

The law does not tolerate criminal convictions on presumptions, and yet there is vastly more of presumption in this case than legitimate proof.    *    *    *

In the last place, we submit that the only crime that was actually committed was an *attempt,* for it is beyond a doubt that the water was not poisoned. Not one solitary witness could discover any bitter taste to the water, no one was made sick, nor died. We respectfully submit that, if the prisoner is guilty of anything, it is an attempt to commit the crime, and for that only should be punished.    *    *    *

Brief of T. C. Catchings, Attorney-General:

The testimony of the physicians, although not expert and professional chemists, was competent for the purpose for which it was offered. State *v.* Hinkle, 6 Iowa, 380; Bierce *v.* Stocking, 11 Gray, 174; Horton *v.* Green, 64 N. C. 64.

There was abundant testimony to show that the substance found in the spring was strychnine. It was contained in bottles of the kind always used to hold strychnine. It is shown by the testimony of the druggists that strychnine is always put up in bottles of the size and shape of those found in the spring. Besides this, they were labeled "strychnine."

Then, upon being tested chemically, the substance was found to be strychnine. On the whole, the proof on this point is convincing.

As to the objection that it was not shown that the water was

poisoned, certain it is that so small a portion of the strychnine had dissolved that the water did not indicate its presence, and no bad effect was observed, either from drinking it or eating food prepared with it. The testimony shows that nearly the whole of the contents of the seven bottles were found imprisoned in the bottles and wrappings. Dr. Jones says that seven drachms would be about a teacupful in quantity. Lou Terry testifies that about a teacupful of the substance was found. Dr. Grant says that a very large portion of the contents of the bottles was found.

Here, then, is the explanation of the fact that the presence of the poison was not indicated by the taste of the water, and of the further fact that the use of the water did not result injuriously to those partaking of it. If it be meant by the assertion of counsel, in their brief, that it was not shown that the spring was poisoned, merely to argue that the substance placed therein could not have been poison, or it would have dangerously infected the water, the proof pointed out by me, that but a trifling portion of it had escaped, is a sufficient refutation of it.

But if it is thereby intended to assert that no violation of the statute is made out unless it is shown that the water was actually poisoned, even where the substance used was an efficient means for poisoning water, and was put therein for that purpose, I deny that the assertion is well founded. If it be correct, there would be no violation if defendant had confessedly and avowedly placed in the spring fifty times the quantity of strychnine necessary to give to every drop of water the power to produce death, and for the admitted purpose of destroying human life, provided its presence there was accidentally detected in time to remove it before the water had become impregnated with it.

Such cannot be the meaning of the statute. It will be satisfied if it is shown that poison capable of poisoning the spring, in quality and quantity, was willfully placed therein by defendant. If I am wrong in this, then I say that the water must have been to some extent poisoned, as some of the strychnine had escaped, though so slightly as not to make its presence known, and the statute does not declare to what degree a spring must be poisoned. This, with the fact that a sufficient quantity, if allowed time to dissolve, was placed in the spring to poison it, undoubtedly satisfies the statute.

While the testimony was wholly circumstantial, the verdict

seems to have been warranted by it. The spring was near the house of John Moore, who used it constantly. He was the avowed enemy of the accused. The defendant had charged him with having ravished his wife, and had made a violent assault upon him in consequence of the alleged wrong done him in this respect. After this he had threatened to take his life. Here, then, is proof of the malice.

Ike Moore, defendant's brother, had, a few days before the poisoning, bought in Raymond, through the agency of Judge Curry, from Mr. Harper, a druggist, a whole bottle of strychnine. Mr. Harper testified that he always kept a registry of poisons sold, and the sale of the bottle to Judge Curry was registered.

He had no knowledge of having sold any other whole bottles of strychnine. On cross-examintion, he said it was possible he might have sold other whole bottles to other persons. He did not mean by this to say that he had probably done so, but only that it was possible. Witnesses nearly always make such answers when pressed by counsel, and it has no significance whatever as testimony. I assume, therefore, that the fair purport of Mr. Harper's testimony was that he had sold no other whole bottle than the one sold Judge Curry.

He wrapped the bottle in an advertisement of one of Ayers' patent medicines, which also contained his own advertisement printed on it. One of the bottles taken from the spring was so wrapped.

The bottle was handed by Judge Curry to Ike Moore. Liv. Moore had been confined in jail, and on the day he bought the strychnine Judge Curry had obtained his release by going on his bond. When he reached home, either on that day or shortly after, he sent one of his tenants or co-laborers, named Harris, to his brother Ike's with a message to him to send "that arr;" and, in response to the message, Ike handed Harris a package, which felt to him like a bottle, and Harris handed this package to Liv. Moore. Here we have almost conclusive testimony that the bottle bought by Isaac was delivered to the defendant.

Dr. Seale testified that about twelve months before the poisoning of the spring he had sold defendant in Terry two bottles of strychnine. He had charged John Moore, it will be noted, in the spring of 1879, with having ravished his wife, had fussed with him and threatened to kill him.

The poison was no doubt bought from Dr. Seale after that difficulty for the purpose of taking his enemy's life with it, but the attempt to use it had, from some cause, been postponed; perhaps that he might obtain a greater quantity of poison to insure the success of his design.

We have now traced directly into his possession three whole bottles of strychnine, in the space of twelve months, a far greater quantity than a man engaged in his business could have any legitimate use for. I forgot to add that, when he bought the two bottles from Dr. Seale, he stated they were for a man named R. H. Harris, and that Dr. Seale knew no such person. Harris evidently was a man of straw, and defendant perpetrated a transparent ruse to avoid suspicion. It was shown that the drug stores in Crystal Springs had sold strychnine, but kept no registry of sale. The other four bottles were doubtless procured in Crystal Springs or elsewhere.

Defendant taught school at Utica during the week, and usually came to his home near Terry every Friday night. He was, on the Saturday the spring was poisoned, to come to Terry to take the cars to Jackson to see the superintendent of education on business, but he did not put in his appearance. He was at home, however, on Sunday, for Judge Curry saw him. Because he did not come to Terry on Saturday, as expected, it is argued that he did not come home until Saturday, but that by no means follows. It is thirty-odd miles from his home to Utica, and, if he could not have come home Friday night, he would not have come at all, as the whole of his vacation would have been consumed in going to and from Utica. It is more reasonable to suppose that he came home Friday night.

The case, therefore, may be summed up against him as follows:

1. He bore deadly malice to John Moore, and had threatened to kill him.

2. He had three bottles of strychnine that we know of directly.

3. He had the opportunity of getting the other four.

4. He had the opportunity of putting the poison in the spring.

5. No other person could have had the motive to do so, and no other person is in any way connected with it, excepting Isaac Moore, of course.

It is submitted that the judgment should be affirmed.

OPINION.—COOPER, J.:

The testimony of Drs. Grant and Bogle was properly admitted. It is not necessary that a witness called upon to testify as to his opinion upon matters of science shall be able to state that he is perfectly familiar with all the principles which are connected with or form a part of the science.   If such was the rule, it is evident that no one would be permitted so to testify, as no one has yet been found who has the requisite information.   Drs. Grant and Bogle state that they are practicing physicians, and, while they have not given any especial attention to chemistry, yet they say that in preparing themselves for the practice of their profession, it was necessary for them to make this a study to an extent sufficient to learn the ordinary and recognized tests for the discovery of strychnine—the method of applying them and the result.   We think the information possessed was sufficient to entitle the State to examine them as experts; the fact that they did not know all the substances to which, if the same test was applied, the same result would follow, did not make the evidence incompetent, but was a fact to be considered by the jury, who, we must suppose, gave only such weight to the testimony as it was entitled to have.   We are unable to say that the verdict of the jury is manifestly wrong on the facts, and the judgment is

*Affirmed.*